No. 14-5093

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**LOST TREE VILLAGE CORPORATION,**

**Plaintiff-Appellee,**

**v.**

**UNITED STATES,**

**Defendant-Appellant.**

Appeal from United States Court of Federal Claims Case No. 08-117L
Judge Charles F. Lettow

## BRIEF OF APPELLEE LOST TREE VILLAGE CORPORATION

Jerry Stouck
Greenberg Traurig LLP
2101 L Street NW, Suite 1000
Washington, DC 20037
(202)331-3173
stouckj@gtlaw.com

*Counsel for Appellee*
*Lost Tree Village Corporation*

September 22, 2014

**Form 9**

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Lost Tree Village Corporation   v. United States

No. 2012-5008

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent)(appellee)(amicus) (name of party)
Lost Tree Village Corporation certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

   Lost Tree Village Corporation

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None.

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Jerry Stouck, Danielle Diaz, Maggie Sklar, Greenberg Traurig, LLP

September 22, 2014
Date

/s/ Jerry Stouck
Signature of counsel

Jerry Stouck
Printed name of counsel

Please Note: All questions must be answered
cc: Matthew Littleton

# TABLE OF CONTENTS

Table Of Authorities ............................................................................. iii

Statement Of Related Cases .................................................................. 1

Jurisdictional Statement ....................................................................... 1

Statement Of The Issues ....................................................................... 1

Statement Of The Case ......................................................................... 2

Statement Of Facts ............................................................................... 6

Standard Of Review ............................................................................. 11

Summary Of Argument ......................................................................... 12

Argument .............................................................................................. 14

    I.    The CFC Correctly Found A *Lucas* Taking, Given That
          The Corps' Permit Denial Precluded Any Economic Use
          Of Plat 57 And Reduced It To Nominal Value ................................... 14

    II.   The CFC Was Also Correct That The Government Is Liable
          For A Taking Under The *Penn Central* Framework .......................... 22

        A.   The CFC Correctly Found That The Devastating
             Economic Impact Of The Corps' Permit Denial
             Strongly Supports A Taking Under *Penn Central* ................... 23

        B.   The Mandate Rule And Law Of The Case Bar
             Consideration Now Of The Other Two *Penn Central*
             Factors, Which Were Within The Scope Of The CFC's
             Previously-Appealed Judgment And Not Remanded
             By This Court .......................................................................... 24

        C.   If Reached, The Government's Arguments About
             Lost Tree's Investment-Backed Expectations At Plat 57
             Are Irrelevant Under *Lucas* And Have No Merit .................... 28

D.  If Reached, The "Character" Factor Also Strongly
        Supports A Taking Under *Penn Central*, Given The
        CFC's Factual Finding That The Corps "Singled Out
        Lost Tree For Adverse Treatment." ...........................................36

  III.    The Government's Criticism Of This Court's Prior Decision
        Is Misplaced And Meritless ..................................................40

Conclusion .................................................................................................43

Certificate Of Service ................................................................................44

Certificate Of Compliance .........................................................................45

# TABLE OF AUTHORITIES

## Cases

*Boggs v. West*,
  188 F.3d 1335 (Fed. Cir. 1999) .................................................................21

*Engel Indus., Inc. v. Lockformer*,
  166 F.3d 1379 (Fed. Cir. 1999) ....................................................... 24, 25

*Florida Rock Inds., Inc. v. United States*,
  18 F.3d 1560 (Fed. Cir. 1994) .................................................................17

*Good v. United States*,
  189 F.3d 1355 (Fed. Cir. 1999) ..............................................................34

*Hormel v. Helvering*,
  312 U.S. 552 (1941) ...................................................................................21

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
  480 U.S. 470 (1987) .............................................................................4, 19

*King Instruments Corp. v. Perego*,
  65 F.3d 941 (Fed. Cir. 1995) ...................................................................11

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005) .......................................................................... passim

*Lost Tree Village Corp. v. United States*,
  707 F.3d 1286 (Fed. Cir. 2013) ...........................................................1, 6

*Loveladies Harbor, Inc. v. United States*,
  28 F.3d 1171 (1994) ........................................................................... 21, 38

*Lucas v. South Carolina Coastal Council*,
  505 U.S. 1003 (1992) ........................................................................ passim

*Norman v. United States*,
  429 F.3d 1081 (2005) .................................................................................32

*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001) .......................................................................... passim

*Palm Beach Isles Assoc. v. United States*,
   208 F.3d 1374 (Fed. Cir. 2000) ...........................................................17

*Palm Beach Isles Assoc. v. United States*,
   231 F.3d 1354 (Fed. Cir. 2000) ...................................................... 17, 29

*Penn Central Transp. Co. v. City of New York,*
   438 U.S. 104 (1978) ................................................................... passim

*Preminger v. Sec'y of Veterans Affairs*,
   517 F.3d 1299 (Fed. Cir. 2008) ...........................................................41

*Resource Invs. Inc. v. United States*,
   85 Fed. Cl. 447 (2009).................................................................. 17, 18

*Rith Energy, Inc. v. United States*,
   270 F.3d 1347 (Fed. Cir. 2001) ...........................................................39

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
   719 F.3d 1305 (Fed. Cir. 2013) ...........................................................41

*Ruckelshaus v. Monsanto*,
   467 U.S. 986 (1984) ...........................................................................35

*Seiber v.United States,*
   364 F.3d 1356 (Fed. Cir. 2004) ...........................................................26

*Suel v. Sec'y of HHS,*
   192 F.3d 981 (Fed. Cir. 2000) .............................................................26

*Toro Co. v. White Consolidated Indus., Inc.*,
   383 F.3d 1326 (Fed. Circ. 2004) .........................................................26

*United States v. Riverside Bayview Homes, Inc.,*
   474 U.S. 121 (1985) ...........................................................................34

## Other Authorities

Dictonary.com, http://dictionary.reference.com...................................16

The American Heritage Dictionary, https://ahdictionary.com ...............16

iv

## STATEMENT OF RELATED CASES

This case was previously before this Court once, *see Lost Tree Village Corp.*

*v. United States,* No. 2012-5008, and on January 10, 2013, a panel of the Court

(Rader, C.J., Newman and Reyna, JJ) issued a decision that is reported at 707 F.3d

1286.  There are no related cases within the meaning of Fed. Cir. Rule 47.5(b).

## JURISDICTIONAL STATEMENT

The government's statement of jurisdiction is correct but omits to mention

that the Court of Federal Claims ("CFC") entered the judgment now on appeal

under CFC Rule 54(b).  *See* Add. 15, 16.[1]

## STATEMENT OF THE ISSUES

The following issues are properly presented in this appeal:

1.    Did the Court of Federal Claims ("CFC") correctly conclude that the

Corps of Engineers' denial of a wetlands fill permit for Plat 57, which reduced that

parcel's value from $4,245,387.93 to "a nominal amount that does not reflect any

economic use," constituted a categorical taking under *Lucas v. South Carolina*

*Coastal Council*, 505 U.S. 1003, 1015 (1992)?

2.    Did the Court of Federal Claims correctly conclude that a taking of

Plat 57 occurred, in addition or in the alternative, under *Penn Central Transp. Co.*

---

[1]Both the Addendum to the government's brief ("Add.__") and the Appendix
("A__") contain copies of previous opinions in this case at pp. 1-71 of each.  We
cite to the Addendum when referring to those opinions.

*v. City of New York,* 438 U.S. 104 (1978), based on the permit denial's devastating economic impact and the character of the Corps of Engineers' action, which not only precluded economic use of the parcel but "singled out Lost Tree for adverse treatment"?

## STATEMENT OF THE CASE

In the prior appeal in this case, the Court agreed with Lost Tree that the only relevant property for purposes of assessing Lost Tree's takings claim is the parcel known as "Plat 57." Add.19. This Court also gave clear instructions about the limited issues remaining to be addressed and decided, focusing on the economic impact of the permit denial giving rise to Lost Tree's takings claim. Add. 26 ("On remand, the court first should determine the loss in economic value to Plat 57 suffered by Lost Tree as a result of the Corps' denial of the § 404 permit, and then apply the appropriate framework to determine whether a compensable taking occurred.").

On remand the Court of Federal Claims ("CFC") followed those instructions and found as a fact that the Corps of Engineers' denial of a wetlands fill permit for Plat 57 precluded any economic use of the parcel and eliminated 99.4% of its value. The CFC found – from largely undisputed trial evidence – that the value of Plat 57 if permitted was $4,245,387.93, but its value without the permit was only "a nominal amount that does not reflect any economic use." Add. 12.

2

Because these findings show that the permit denial deprived Lost Tree of "all economically beneficial or productive use of land," the CFC properly held that it constituted a categorical taking under *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015 (1992). "For completeness," the CFC "also applied the Supreme Court's *Penn Central* framework." Add. 12; *see Penn Central Transp. Co. v. City of New York,* 438 U.S. 104 (1978). The CFC found a taking on that basis as well, largely because of the same, very severe economic impact of the permit denial. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005) ("[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulations' economic impact and the degree to which it interferes with legitimate property interests.").

In response to this straightforward application of settled Supreme Court precedent, the government in the current appeal ignores the economic impact issue that this Court correctly understood to be the principal – if not the only – remaining issue in the case. Instead, the government attempts to defeat Lost Tree's takings claim by arguing about issues that have nothing to do with the economic impact of the permit denial on Plat 57. Those issues were litigated and resolved before the first appeal, were not remanded, and are now barred by the mandate rule and law of the case.

In addition, the government's current appeal arguments have no merit. The government's claim that Lost Tree has no legitimate "investment-backed expectations" is directly contrary to a finding at the heart of this Court's prior decision, namely, that Lost Tree had well-defined economic expectations for Plat 57 that were distinct from its plans for the rest of the John's Island community. Add. 25. The government's suggestion that the existence of a wetlands permitting scheme defeats any takings claim based on a permit denial is an extreme and untenable view that was explicitly rejected by the Supreme Court in *Palazzolo v. Rhode Island*, 533 U.S. 606, 626-630 (2001). And the government's theory that no taking occurred because the current, "nominal" value of Plat 57 is nevertheless greater than what Lost Tree paid 40 years ago is contrary not only to this Court's instruction to focus on the economic impact of the permit denial, but also to another Supreme Court takings precedent requiring that same focus. In *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497 (1987), the Court instructed that "our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property."

The determination of the relevant property parcel was the only real issue in this case. Having lost that issue in the prior appeal, the government now must accept the consequences of the devastating economic impact of the Corps' denial of the wetlands fill permit for Plat 57. Under both *Lucas* and *Penn Central*, a

compensable taking occurs where, as here, government regulatory action reduces the value of property from more than $4.2 million to only "a nominal amount that does not reflect any economic use." Add. 12. That is particularly so given the CFC's additional factual finding that Corps of Engineers' denial of a permit for Plat 57 "was targeted to Lost Tree" and "singled out Lost Tree for adverse treatment." Add. 56-57.

In short, focusing solely on Plat 57 as this Court directed in the prior appeal, the permit denial at issue here was confiscatory. It left Lost Tree with no economic use for Plat 57, and thus was the functional equivalent of a direct condemnation of the parcel. *See Lingle,* 544 U.S. at 539 (Noting that both *Lucas* and *Penn Central* "share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes on private property rights."). The Takings Clause therefore requires the government to pay Lost Tree just compensation, as the CFC held. There is no error in that holding, and the government does not dispute the amount of just compensation the CFC awarded. The judgment below therefore should be affirmed.

## STATEMENT OF FACTS

In accordance with Federal Circuit Rule 28(b), this fact statement is "limited to specific areas of disagreement" with the fact statement in the government's opening brief. Lost Tree has three substantial disagreements with the government's fact statement.

First, given this Court's clear instructions in its prior opinion that the principal issue remaining to be decided is the economic impact of the permit denial on Plat 57, most of the government's factual discussion in its brief is irrelevant at this stage of the case. This Court's instructions, which the government's brief does not mention, were explicit:

> After a careful review of the entire record, this court determines that the relevant parcel is Plat 57 alone. . . . *On remand, the court first should determine the loss in economic value to Plat 57 suffered by Lost Tree as a result of the Corps' denial of the § 404 permit*, and then apply the appropriate framework to determine whether a compensable taking occurred. *In determining the loss in value to Plat 57*, the court may revisit the property values it adopted in the course of determining the impact of the Plat 57 permit denial on Lost Tree under its definition of the relevant parcel.

Add. 25-26; *see Lost Tree Village Corp. v. United States,* 707 F.3d 1286, 1294-1295 (Fed. Cir. 2013).

The CFC followed these instructions and focused the remand proceedings on determining the economic impact of the permit denial on Plat 57. *See* Add. 5-7, 8-14. In this appeal, however, despite the Court's directive to focus on Plat 57 "alone" and on the economic impact of the permit denial, the first eight pages of the factual recitation in the government's brief addresses portions of the John's Island community *other than* Plat 57. *See* USBr9-16. The remaining five and one-half pages of the government's factual discussion, *see* USBr17-22, which do address Plat 57, do not *mention* the economic impact of the permit denial on Plat 57. Thus the facts the government presents are largely irrelevant to this appeal.[2]

Second, the government's description of prior proceedings in this case is incomplete. Most importantly, the government omits to mention this Court's explicit instructions, quoted above, regarding the focus that should be placed on

---

[2] The government's fact statement also fails to follow or even acknowledge the extensive findings of fact made by the CFC following the seven-day trial in this case. The government's reliance instead on disputed trial evidence is misplaced and often misleading. For example, the government's brief mentions several different times that a Lost Tree consultant purportedly "represented that the company did not intend to develop other wetlands in the community after Plat 54." USBr40; *see* USBr16, 21n.4. The consultant denied that in his testimony, A1684-85, and even the testimony of the government's witness with whom the consultant spoke acknowledged that the consultant excepted from his statement "parcels" – like Plat 57 – "that were inaccessible, or that they had not surveyed to see if there were developable uplands." A2190; *see* USBr21n.4 (quoting Corps decision document noting same "exception"). This factual tidbit is irrelevant to any issue in this appeal, but the government's repeated misstatement makes Lost Tree's consultant appear untrustworthy, contrary to the testimony of the government's own witness.

the economic impact issue following the Court's previous decision that the only
relevant property to consider is Plat 57.  The government's discussion of the
remand proceedings also fails to mention that the CFC followed this Court's
instructions fully, including the directive that "[i]n determining the loss in value to
Plat 57, the court may revisit the property values it adopted in the course of
determining the impact of the Plat 57 permit denial on Lost Tree under its
[previous, erroneous] definition of the relevant parcel."  Add. 26.  In accordance
with that suggestion, on remand the CFC allowed the government to make an
evidentiary proffer to support "a new theory for valuing the economic impact of
the permit denial" which the government first proposed in the remand proceedings
to displace its expert's trial testimony concerning economic impact.  Add. 10-11.

The CFC ultimately rejected the government's proffer on both procedural
and substantive grounds, finding 1) it "d[id] not provide the court with enough
substantive detail to determine the probative value of the evidence," Add. 11; 2)
"nor has the government provided any explanation for its failure to pursue its new
theory earlier," Add. 11; and 3) "[e]ven if the court were to find the government's
proffer to be adequate, the proposed alternative valuation method has no merit,"
Add. 11.  Though the CFC thus rejected the government's new economic impact
theory, it is important to emphasize that in the remand proceedings – unlike here –
the government did follow this Court's instruction to focus on economic impact.

8

Lost Tree's third disagreement with the fact statement in the government's brief is that it does not discuss, or even mention, the CFC's findings of fact on the economic impact issue that this Court found to be the principal remaining issue in the case. At trial, both parties' experts followed the same methodology in determining the economic impact of the permit denial. Accordingly, the CFC "determine[d] the economic impact of the permit denial according to the evidence previously submitted by both parties at trial, which presumed the relevant economic pinpoints were Plat 57 without a permit compared to Plat 57 with a permit and put to its highest and best use." Add. 12. The CFC found that the value of Plat 57 with the permit was $4,245,387.93, and without the permit was $27,500, which the trial testimony of both parties' experts showed was "a nominal amount that does not reflect any economic use." Add. 12. Specifically, the government's expert testified that "the highest and best use of Plat 57 without a permit was as 'passive recreation,' which he described as 'a place where human beings can go for relaxation, they can go to enjoy nature.'" *See* Add. 8-9 (citing A2520). Lost Tree's expert "concluded that without the permit the property is 'relegated to basically a wetland parcel with little or no economic use except at nominal levels that may be related to nuisance value or environmental use.'" *See* Add. 8 (citing DX134 at A6626).

9

As the CFC recognized, ultimately "the inquiry is whether Plat 57 retains any economically beneficial use without a Section 404 permit." Add. 8. The CFC found as a fact that the answer is "no," based on the trial evidence cited by the CFC and outlined above. The CFC therefore concluded that the severe economic impact of the permit denial – which eliminated 99.4% of Plat 57's value – "constitutes a categorical taking under *Lucas,* particularly because "the assigned valuation without a permit is a nominal amount that does not reflect any economic use." Add. 12.

The CFC also concluded that "[a]n analysis under the *Penn Central* framework leads to the same result, *i.e.,* that a compensable taking occurred." Add. 14. In reaching this conclusion, the CFC determined that the permit denial's severe economic impact on Plat 57 "weighs very strongly in Lost Tree's favor." Add. 14. The CFC found "[n]o need . . . to reconsider its prior findings," following trial and before the first appeal, regarding the other two *Penn Central* factors – the character of the government action and interference with investment-backed expectations. Add. 12. The CFC therefore applied the conclusions it had reached previously, that the "character" factor favored Lost Tree because the Corps' permit denial "singled out Lost Tree for adverse treatment" and the "investment-backed expectations" factor favored neither party. Add. 13; *see* Add. 55-57 (discussion of these two factors in CFC's post-trial decision).

The CFC awarded just compensation of $4,217,887.93, plus interest.  Add. 15.

## STANDARD OF REVIEW

Lost Tree agrees with the government's description of the standard of review to the extent it states that the Court reviews legal conclusions *de novo* and factual findings for clear error, and that a plaintiff like Lost Tree ultimately bears the burden of proving its claim.  *See* USBr27.

Lost Tree disagrees with the government's statement that Lost Tree has a burden here "to show the economic impact of the governmental action on the claimant," USBr27, or "to establish distinct and reasonable investment-backed expectations," USBr28.  The CFC found as a fact, from largely undisputed evidence, that the Corps' permit denial had very severe economic impact, *see, e.g.,* Add. 12, and also found factually that Lost Tree had reasonable investment-backed expectations for Plat 57.  *See* Add. 13 ("Lost Tree's expectations were not unreasonable").  This Court agreed that "[t]he trial court's factual findings support the conclusion that Lost Tree had distinct economic expectations for . . . Plat 57." Add. 25.  Contrary to the government's statement, those findings must be accepted here unless the government meets its burden to establish that they are clearly erroneous, which the government has not even alleged.  *See King Instruments Corp. v. Perego*, 65 F.3d 941, 945 (Fed. Cir. 1995) ("The party seeking reversal of

a district court decision bears the burden of showing reversible legal error or clear factual errors in light of the trial record.").

## SUMMARY OF ARGUMENT

On remand the CFC followed the explicit instructions this Court issued in the prior appeal, after the Court concluded there that the only relevant property to consider in assessing Lost Tree's takings claim is Plat 57. The CFC first "determine[d] the loss in economic value to Plat 57 suffered by Lost Tree as a result of the Corps' denial of the § 404 permit," and "then applied] the appropriate framework to determine whether a compensable taking occurred." *See* Add. 26; Add.8-14. The government does not contend that the CFC failed to follow this Court's remand instructions.

Based on evidence presented at trial by both parties' experts, which was largely undisputed, the CFC found as a fact that the Corps' denial of the wetlands fill permit at Plat 57 had a very severe economic impact on the parcel, reducing its value by 99.4%, from more than $4.2 million to $27,500, which the evidence established and the CFC found was a "nominal amount that does not reflect any economic use." Add. 12; *see* Add. 8 (Noting trial testimony that without the permit, Plat 57 "has little or no economic use except at nominal levels."). Because the permit denial "eliminate[d] all economically beneficial use" of Plat 57, the CFC correctly concluded that it constituted a taking under *Lucas*, 505 U.S. 1003.

As the Supreme Court explained in that case, "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Id.* at 1019; *see id.* at 1017 ("[T]otal deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation.").

The CFC was also correct that application of the *Penn Central* factors "leads to the same result, *i.e.,* that a compensable taking occurred." Add. 14. As the Supreme Court explained in *Lingle,* 544 U.S. at 540, "the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulations' economic impact and the degree to which it interferes with legitimate property interests." Thus, as the CFC found, the severe economic impact of the permit denial here "weighs very strongly in Lost Tree's favor under *Penn Central*." Add. 14. The CFC was also correct that the "character" factor favored Lost Tree, given the court's factual finding that "the Corps singled out Lost Tree for adverse treatment." Add. 13.

On appeal, the government does not dispute that the CFC faithfully and fully followed this Court's remand instruction to focus on the economic impact issue. Nor does the government dispute the CFC's factual finding that the Corps' permit denial reducing Plat 57's value from more than $4.2 million to "a nominal amount that does not reflect any economic use." Instead, in response to the CFC's

13

straightforward application to those facts of settled Supreme Court law – *Lucas* and *Penn Central* – the government attempts to defeat Lost Tree's takings claim with several arguments that have nothing to do with economic impact. Those arguments have no merit. Several of them are not even properly before the Court, because they were resolved by the CFC before the prior appeal, were not remanded, and are therefore barred by the mandate rule and law of the case.

The government's misplaced and meritless arguments should be rejected and the CFC's judgment should be affirmed.

## ARGUMENT

I.    **The CFC Correctly Found A *Lucas* Taking, Given That The Corps' Permit Denial Precluded Any Economic Use Of Plat 57 And Reduced It To Nominal Value**.

The government first challenges the CFC's principal holding that the Corps' permit denial at Plat 57 constitutes a categorical taking under *Lucas*. Ignoring this Court's directive that the key remaining issue after the previous appeal is the economic impact of the permit denial on Plat 57 – *i.e.,* the difference between the value of Plat 57 with and without the permit – the government argues that value supposedly remaining in the parcel precludes application of the *Lucas* rule. Noting that the CFC found the fair market value of Plat 57 without the permit was $27,500, the government asserts that *Lucas* is inapplicable because Lost Tree did not suffer a "total loss;" rather, the government says, Plat 57 retains a "solid and

14

adequate" value because Lost Tree could "sell the parcel for more than its inflation adjusted purchase price." USBr30-34.

This argument is wrong both legally and factually. Legally, Lost Tree did suffer a total loss. The test under *Lucas* is whether the government's regulatory act requires a landowner to leave his property "economically idle," *see* 505 U.S. at 1019; that is, whether the regulation "denies all economically beneficial or productive use of land." *Id.* at 1015. That test is unquestionably met here, and the government does not contend otherwise. The government points to no "economic use" of Plat 57 that can be pursued without the Corps' permit, and the trial record contains no evidence of any such use. To the contrary, the CFC specifically found that the $27,500 figure was "a nominal amount *that did not reflect any economic use*." Add.12 (emphasis). Indeed, both parties' experts testified that without the Corps' permit Plat 57 had no economic use. Add. 8 (Lost Tree appraiser: "no economic use except at nominal levels . . . related to nuisance value or environmental use"); Add. 8-9 (government appraiser: "highest and best use" without permit is as "a place [to] go for relaxation, . . . to enjoy nature"); *see* A1825 (testimony of Lost Tree appraiser: "conservation and/or open space use").

In addition, dictionaries define "nominal" as "being such in name only; so-called;[3]" and "[e]xisting in name only; not real.[4]"  The CFC's use of the term "nominal" to describe the $27,500 figure fits that definition – "not real;" and "in name only" – and also reflects the explicit trial testimony that Plat 57 had no economic value, just a "nominal" value:

Q      . . . . And is it your view that there's any economic value to this land?

. . . .

A      No, I do not recognize that there's any economic value, and in those cases I generally estimate – I try to find sales of other types of property that don't have any economic value.  But as one might suspect, those types of properties are rarely sold. . . . So I found no comparable sales that I could use as direct comparisons to this property, and therefore I estimated that it really would be relegated to nominal values.  In my experience, the nominal value for real estate usually approaches somewhere between zero and 1 percent of its value if it were developable.

And in this case, because I estimated a retail value of $4,800,000, I estimated it would be in the middle of that range, about half a percent, which rounded is $25,000.

---

[3] Dictonary.com, http://dictionary.reference.com/browse/nominal?s=t (last visited Sept. 22, 2014)

[4] The American Heritage Dictionary, https://ahdictionary.com/word/search.html ?q=nominal&submit.x=28&submit.y=23 (last visited Sept. 22, 2014)

A1825-26; *see also* A1824 ("In some cases these properties actually become a

burden because there is a tax."); A1471 (testimony of Lost Tree's President that

due to taxes on Plat 57, its value was negative).

Case law also supports the CFC's conclusion that without the Corps' permit

Plat 57 has only a "nominal" value that does not make *Lucas* inapplicable.  For

example, in comparable circumstances this Court had no difficulty finding a

categorical *Lucas* taking in *Palm Beach Isles Assoc. v. United States*, 208 F.3d

1374 (Fed. Cir. 2000).  As the Court explained there, "[o]nce the proper parcel

[wa]s defined as the 50.7 acres, it bec[a]me[] clear that, without the dredge and fill

permits, the entire 50.7 acres . . . have no *or minimal* value." *Id.* at 1381 (emphasis

added).  *See Palazzolo*, 533 U.S. at 631 ("Assuming a taking is otherwise

established, a State may not evade the duty to compensate on the premise that the

landowner is left with a token interest."); *Florida Rock Inds., Inc. v. United States*,

18 F.3d 1560, 1567 (Fed. Cir. 1994) (Indicating that the Court of Federal Claims

would be correct to find a categorical taking where 95% of the economic value of

the land was lost); *Resource Invs., Inc. v. United States*, 85 Fed. Cl. 447, 488

(2009) (Explaining that "categorical treatment remains appropriate even if a parcel

maintains some nominal value, so long as the claimant is without economically

viable use of his property.") (citations omitted); *see also Palm Beach Isles Assoc.*

*v. United States*, 231 F.3d 1354, 1357 (Fed. Cir. 2000) (Referring to a *Penn*

17

*Central* taking as one that "leaves the owner with substantial viable economic use").[5]

Factually Lost Tree also suffered a total loss. Plainly a landowner whose property is left with no economic use has suffered a total loss. Even accepting the $27,500 figure, the Corps' permit denial wiped out 99.4% of Plat 57's value. Add. 12. The government cites no case even suggesting that a deprivation of that magnitude is not a categorical taking under *Lucas,* and Lost Tree is aware of none. Moreover, the government's suggestion that Lost Tree could sell Plat 57 for $27,500 is a fantasy. Add. 32. Uncontroverted trial testimony established that Lost Tree never had an offer to purchase the parcel. A1472. And why would anyone buy it? Without the Corps' wetlands fill permit the only lawful use of Plat 57 – as a homesite, *see* A2023 – is precluded, and the parcel's current "environmental" use can be enjoyed fully by neighbors and others without paying a dime.

The government's alternative theory that *Lucas* does not apply here because Plat 57's current nominal value of $27,500 exceeds what Lost Tree paid for the parcel 40 years ago is legally and factually wrong. Legally, comparing a property's current value to its purchase price has never been the takings test. The

---

[5] *See also Resource Invs., Inc.,* 85 Fed. Cl. at 487 ("Both in its holding and its reasoning, *Lucas* . . . focuses on whether a regulation permits *economically viable use* of the property, not whether the property retains some value on paper.") (citations omitted).

touchstone in takings jurisprudence is economic impact.  *See, e.g., Keystone,* 480 U.S. at 496 ("[O]ur test for a regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property.").  The government's novel theory is not only contrary to that touchstone and to this Court's explicit instruction to focus on economic impact.  It is also contrary to *Lucas* itself, which focused on economic impact and imposes takings liability where "regulation denies all economically beneficial or productive use of land."  The CFC's factual findings establish that the Corps' permit denial did precisely that at Plat 57.

The government cites no precedent in support of its new theory from this or any other court, and Lost Tree is aware of none.  That is not surprising given that the theory is contrary to *Lucas* and other takings precedent.  The government's proposed test also would have the anomalous and illogical effect of making takings liability turn on when, and for how much, a landowner purchased her property.  A landowner who purchased Blackacre for a $1 million on day 1 and then on day 2 encountered a regulation that eliminated all economic use of the property could collect just compensation of $1 million because she "gained nothing" from ownership of the property.  But if the same landowner had purchased the same property 40 years earlier, for $100,000, she could not recover for the same regulatory imposition – even though it wiped out any economic use of Blackacre –

because, after all, the current $1 million value of the property represented a huge profit to the landowner. No court has ever suggested that result. In each of these examples the landowner suffered the same, million-dollar loss, and that is what matters in a takings case, not the purchase date or price of the property taken.

Factually the government's theory shows nothing more than that the inflation rate over the past 40 years has increased Plat 57's value by a commensurate amount. Utilizing the "inflation calculator" on the Bureau of Labor Statistics' website at bls.gov/data/inflation-calculator.htm, if one plugs in the $5370 of purchase price allocated to Plat 57 under the purchase contract, *see* A2028, and specifies that that input is in 1974 dollars, the inflation calculator reports that the value of those dollars today, solely because of inflation, is $25,951.37. This, compared to the nominal $27,500 figure, is hardly the windfall the government attempts to suggest.[6]  In any event, the entire exercise is irrelevant under both *Lucas* and takings jurisprudence generally, which focus on the economic impact of regulation on property and not on the property's appreciation over time. At least the government has retreated from the more extremely misleading claim in its post-trial brief, based on the same inflation rate data, that "the property has appreciated 465% since its acquisition." *See* A2880.

---

[6] As the government notes, USBr32, the BLS calculator shows the inflation-adjusted purchase price was $20,575.92 in 2004.

20

Finally, this Court should not even consider the government's new theory, because the government never raised it in the remand proceedings. The government did mention this theory in its post-trial brief to the CFC before the prior appeal. But on remand in the CFC the government followed this Court's direction and focused on the economic impact of the permit denial, although as noted above the government attempted on remand to interject an entirely new economic impact theory. *See* Add. 10. In these circumstances, and given that this Court remanded the economic impact issue but not the appreciation-in-value issue, the government's new theory is barred by the rule against raising new issues for the first time on appeal. *See, e.g., Boggs v. West*, 188 F.3d 1335, 1337-38 (Fed. Cir. 1999) ("As a general rule, an appellate court will not hear on appeal issues that were not clearly raised in the proceedings below. . . [which] ensures that 'parties may have the opportunity to offer all the evidence they believe relevant to the issues….'") (citing *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)).[7]

---

[7]The government indulges another fantasy when it suggests the decision below would allow speculators to purchase regulated property on the cheap, apply for development permits on a lark, and then if the permits are denied collect just compensation. *See* USBr33. In the real world, real estate investors do not commit valuable capital either to undevelopable property or to long, drawn-out, expensive and uncertain takings lawsuits. *See also* A3069 (Lost Tree brief in prior appeal, fn. 4, explaining that the possibility of abuse in some other case is no reason not to apply settled precedent in this case, where the facts cannot possibly be construed to reflect "strategic behavior" by Lost Tree, and noting that this Court responded similarly to a similar government concern in *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1181 (1994)).

21

In sum, the CFC was correct to find a taking under *Lucas*.

## II. The CFC Was Also Correct That The Government Is Liable For A Taking Under The *Penn Central* Framework.

The government also challenges the CFC's alternative holding that the Corps' permit denial at Plat 57 was a taking under *Penn Central*. In that case, which was decided before *Lucas* established its categorical rule, the Supreme Court explained that although takings often depend on "the particular circumstances," three factors "have particular significance:" economic impact, interference with investment-backed expectations, and the character of the government's action. 438 U.S. at 124 (citation omitted). The CFC alternatively found a taking applying this framework. It concluded that the economic impact factor weighed "very strongly" in Lost Tree's favor, the character factor also favored Lost Tree and the investment-backed expectations factor favored neither party – although the court found that Lost Tree's investment-backed expectations at Plat 57 were "not unreasonable." Add.12-14.

The CFC's application of *Penn Central* was also sound. By definition a taking may be found under *Penn Central* in cases where the "categorical" rule of *Lucas* would not apply. Therefore, even if the facts here did not establish a *Lucas* taking – which they do – the CFC was correct to find that the severe economic impact of the Corps' permit denial and its targeting of Lost Tree establishes a taking under the broader *Penn Central* test.

22

**A.    The CFC Correctly Found That The Devastating Economic Impact Of The Corps' Permit Denial Strongly Supports A Taking Under *Penn Central*.**

In discussing *Penn Central*, the government again essentially ignores the economic impact factor, and instead focuses on the investment-backed expectations factor and the character factor.  USBr34-39.  The government's only passing reference to economic impact in its *Penn Central* discussion asserts that "the company's [*i.e.,* Lost Tree's] injury was not severe in light of the minimal cost of acquiring Plat 57 . . . ."  Add.49.  That statement is simply false.  As the CFC found, Lost Tree has been denied all economic use of property worth more than $4.2 million.  By any measure, that is a severe economic injury.

The CFC was correct to conclude that this severe economic impact "weighs very strongly in Lost Tree's favor under [ ] *Penn Central*."  Add.14.  Contrary to the government's dismissal of this severe economic impact in its *Penn Central* discussion, the Supreme Court has made clear that "the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulations' economic impact and the degree to which it interferes with legitimate property interests." *See Lingle*, 544 U.S. at 540.  Indeed, in *Penn Central* itself, the Supreme Court stated that the takings question there ultimately "may be narrowed to the question of the severity of the impact of the law on appellants' parcel."  438 U.S. at 136. *See also Lingle,* 544 U.S. at 540 (Explaining that *Lucas* and *Penn Central* "share a

23

common touchstone. Each aims to identify regulatory actions that are functionally

equivalent to the classic taking in which government directly appropriates private

property. . . . Accordingly, each of these tests focuses directly upon the severity of

the burden that government imposes upon private property rights.").

> **B.    The Mandate Rule And Law Of The Case Bar Consideration Now
> Of The Other Two *Penn Central* Factors, Which Were Within
> The Scope Of The CFC's Previously-Appealed Judgment And Not
> Remanded By This Court.**

The government's discussion of *Penn Central*'s investment-backed

expectations factor and character factor also have no merit for the reasons

discussed below. Initially, however, the government is not even entitled to re-

argue those issues in this appeal, because as the CFC found, the Court's mandate

from the prior appeal bars the government from doing so. *See* Add. 6, 7

(discussing this Court's mandate and the mandate rule).

Under the mandate rule, "[u]nless remanded by this Court, all issues within

the scope of the appealed judgment are deemed incorporated within the mandate

and thus are precluded from further adjudication." *Engel Indus., Inc. v.

Lockformer,* 166 F.3d 1379, 1383 (Fed. Cir. 1999). The CFC's previous, post-trial

opinion set forth factual findings and legal conclusions regarding both the *Penn

Central* investment-backed expectations factor and its character factor. Add.55-57.

Those findings and conclusions were squarely "within the scope of the appealed

judgment," which rested on the CFC's original determination that, given its view

24

of the relevant property parcel, the Corps' permit denial did not constitute a taking when analyzed against the three *Penn Central* factors. *See* Add.57. On appeal this Court reversed on the relevant parcel issue, and explicitly remanded the economic impact issue with instructions to focus on Plat 57 alone. In contrast, this Court did not remand the investment-backed expectations issue or the character issue. Therefore, the mandate rule bars consideration of those issues now. *See* Add.12 (CFC recognizing that "[n]o need exists for the court to reconsider its prior findings regarding . . . the character of the government action and investment-backed expectations.").

The government claims in a footnote that it "preserved its disagreement with the trial court's analysis of all three *Penn Central* factors," citing a brief the government filed in the prior appeal and its motion for judgment on remand. USBr34. But the question under the mandate rule is not whether the investment-backed expectations issue and character issue were preserved, the question is whether those issues were within the scope of the appealed judgment and not remanded. *See, e.g., Engel,* 166 F.3d 1383. If those conditions are met, which is the case here, further consideration of the issues is barred.

The fact that the government raised these issues in the prior appeal cuts the wrong way – it shows that this Court could have, but did not, remand the issues. Tellingly, the government's brief does not even claim that this Court remanded the

investment-backed expectations issue or the character issue.  *See* USBr34.  Nor could the government make such a claim, because this Court's prior opinion makes clear that only the economic impact issue was remanded.  *See* Add.25-26.  The government's brief also does not even mention the mandate rule, much less refute the CFC's application of the rule here.

The law of the case doctrine, which the government does discuss (as did the CFC), *see* USBr34-35, also should be held to bar reconsideration of the two *Penn Central* factors other than economic impact.  Add. 13 (noting that law of the case supported CFC's refusal to revisit its findings concerning the investment-backed expectations and character factors).  As this Court has explained, the law of the case doctrine "'ensures judicial efficiency and prevents endless litigation.  Its elementary logic is matched by elementary fairness – a litigant given one good bite at the apple should not have a second . . . Under law of the case, then, a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation."  *Suel v. Sec'y of HHS,* 192 F.3d 981, 984-85 (Fed. Cir. 2000); *see Toro Co. v. White Consolidated Indus., Inc.*, 383 F.3d 1326, 1335 (Fed. Circ. 2004) ("The doctrine of law of the case was 'created to ensure judicial efficiency and to prevent the possibility of endless litigation.'") (citation omitted).

As against the mandate rule and law of the case, the government contends, citing *Seiber v.United States,* 364 F.3d 1356, 1370 (Fed. Cir. 2004), that "this

Court's redefinition of the parcel-as-a-whole *compelled* the trial court to reevaluate th[e investment-backed expectations and character] factors." USBr35 (emphasis in original). Nothing stated in *Seiber* supports that contention. Nor was there any reason on remand to revisit these two factors, as the CFC recognized, *see* Add. 12-13, because as discussed below the CFC's initial analysis of these factors already focused on Plat 57. Indeed, this Court specifically recognized that "[t]he trial courts factual findings support the conclusion that Lost Tree had distinct economic expectations for . . . Plat 57." Add.25. This Court's previous decision requiring a focus on Plat 57 therefore provided no occasion for the CFC to revisit its initial analysis.

The government also claims that in the prior appeal "the panel expressly recognized that '[d]efinition of the relevant parcel . . . affects the *Penn Central* inquiry into . . . investment-backed expectations." USBr35 (citing A23). That claim implies misleadingly that redefinition of the relevant parcel affects the *nature* of a landowners' investment-backed expectations. What the previous panel actually said, however, is that "[d]efinition of the relevant parcel . . . affects the *Penn Central* inquiry into *the economic impact of the regulation* on the claimant and *on investment-backed expectations.* Add.23 (emphasis added). That makes sense in a case like the present, because focusing on Plat 57 alone as the relevant parcel concentrates the economic impact of the permit denial on Lost Tree's

27

economic expectations for that parcel. The government's brief omits the "economic impact" phrase from the sentence in this Court's prior opinion and replaces it with ellipsis, *see* USBr35, which changes the meaning.

In sum, under both the mandate rule and law of the case, the CFC correctly refused to revisit the conclusions it reached before the prior appeal concerning the *Penn Central* investment-backed expectations and character issues, and this Court should likewise reject the government's request to address those issues now.

**C.    If Reached, The Government's Arguments About Lost Tree's Investment-Backed Expectations At Plat 57 Are Irrelevant Under *Lucas* And Have No Merit.**

If the Court reaches the government's arguments about Lost Tree's investment-backed expectations at Plat 57, it should reject should them. As noted above, in the prior appeal this Court recognized that "[t]he trial court's factual findings support the conclusion that Lost Tree had distinct economic expectations for . . . Plat 57." Add.25. In fact, the "distinct economic expectations" that Lost Tree had for Plat 57 were important to this Court's holding that that parcel alone was the relevant property to consider assessing Lost Tree's takings claim. As the Court explained, "in determining the relevant parcel where the landowner holds (or has previously held) other property in the vicinity, . . . the '*critical issue* is "the economic expectations of the claimant with regard to the property."'" Add.24 (citations omitted) (emphasis added).

28

In the face of this Court's previous reliance on the "distinct economic expectations" that the CFC found Lost Tree to have regarding Plat 57, the government now claims, to the contrary, that Lost Tree's investment-backed expectations are so lacking in legal and factual merit that this factor alone defeats Lost Tree's takings claim under *Penn Central*. *See* USBr48-49. The government's position is what lacks merit. The Court should reject it.

First, as the government acknowledges, this Court has held and subsequently "treated . . . as a settled question" that investment-backed expectations are not relevant to categorical takings liability under *Lucas*. USBr50 & n.11. Because in the present case the CFC correctly concluded that the Corps' permit denial constitutes a taking of Plat 57 under *Lucas*, the government's investment-backed expectations arguments are irrelevant.

The government purports to "preserve" this issue for further appeal, but as it also acknowledges, this Court has already denied rehearing *en banc* on this issue. USBr50-51; *see Palm Beach Isles*, 231 F.3d 1365. Moreover, even if further appellate review of this issue led to a determination that investment-backed expectations are relevant to a *Lucas* taking, that determination would not help the government. This Court and the CFC have already recognized that Lost Tree had "distinct economic expectations" for Plat 57. The Corps' permit denial destroyed those expectations no less than the economic value of the parcel. And the same

conclusion also applies under the *Penn Central* framework:  the Corps' permit

denial in this case destroyed Lost Tree's "distinct economic expectations" for Plat

57.

The government does not deny that fact, nor could it.  Lost Tree's "distinct

economic expectations" reflected findings of fact that the CFC made based on

extensive trial evidence that this Court also reviewed and endorsed in its prior

opinion.  Add.24-25.  The government does not even suggest that those factual

findings were clearly erroneous.

Instead, the government attempts to denigrate Lost Tree's "distinct

economic expectations" for Plat 57 with three legal arguments.  None has merit.

First, the government claims that "Lost Tree's expectations must be analyzed as of

August 1974, when the company acquired Plat 57," USBr36.  This is nothing but a

criticism of the later-arising "distinct economic expectations" that the CFC found

to exist and this Court relied on in its previous decision.  Accordingly, as the CFC

stated, this argument "has no merit."  Add.13-14n.10.

The government cites decisions referring to investment-backed expectations

that arose when the landowner acquired property, USBR36, but it cites no decision

– and Lost Tree is aware of none – holding that the *only* economic expectations

relevant to the takings analysis are those existing at the time of purchase.

Conversely, this Court has held in this very case that Lost Tree's "distinct

economic expectations" for Plat 57, which arose many years after Lost Tree purchased the parcel, were a "critical issue" leading this Court to hold that Plat 57 alone is the relevant takings parcel. *See* Add.24; *see also* Add.13 (CFC: "In its prior decision, the court found that Lost Tree had developed overarching, unspecific development expectations when it acquired [the land that included] Plat 57, and by 2001 or 2002, Lost Tree had developed investment-backed expectations specifically for Plat 57.").

In addition to lacking any precedent and being contrary to this Court's prior decision in this case, a rule limiting investment-backed expectations to those existing at the time of purchase makes no sense. Zoning requirements change over time, and so do development plans. As a result, many landowners form new, or different, or additional investment-backed expectations for their property after the date on which they first acquired it. Under the government's proposed rule, those later-arising expectations would always count for nothing in the *Penn Central* analysis, no matter how reasonable the expectations are and how much the landowner has invested to develop them. That is not and should not be the rule in takings cases. Development plans evolve, and so do economic expectations for the use of property. Neither law nor logic limits cognizable investment-backed expectations to those existing on the date property is purchased.

31

Second, the government also seeks to deny the legitimacy of Lost Tree's

"distinct economic expectations" for Plat 57 – both at the time of purchase and in

2001-02 when Lost Tree sought to develop the parcel – by pointing to federal

wetlands regulations that existed at both points in time.  *See* USBr37-38 (1974

regulations); USBR39-41 (referring to later regulations).  But the government

acknowledges that "[p]re-existing regulations are not necessarily dispositive of the

reasonableness of a landowner's expectations."  USBr37.  The government could

hardly deny that principle, which was the holding in *Palazolla,* 533 U.S. 606, as

this Court has recognized.  *See Norman v. United States,* 429 F.3d 1081, 1092

(2005) ("[A] takings claim 'is not barred by the mere fact that title was acquired

after the effective date of the state-imposed restriction.'") (quoting *Palazolla,*533

U.S. at 630).  Under *Palazolla,* a pre-existing regulatory scheme is just "one

factor" to consider in assessing a regulation's impact on investment-backed

expectations.  *See* 533 U.S. at 634 (O'Connor, J., concurring).

In this case, other factors that were stipulated by the parties or found by the

CFC to exist support the reasonableness of Lost Tree's investment-backed

expectations at Plat 57.  For example,  i) over the years Lost Tree had obtained

from the Corp's several Section 404 fill permits at the John's Island community,

*see* A2018, A2021, A2022; ii) another company having common ownership and

management with Lost Tree (*i.e.,* Horse's Head, Ltd.) obtained a wetlands fill

permit from the Corps for a few residential lots near Plat 57 in 2000, just before

Lost Tree began attempting to develop Plat 57, A2027; *see* Add.43; iii) Lost Tree

obtained a preliminary plat and approval to develop a homesite on Plat 57 from

local town authorities, a wetlands fill permit from the relevant Florida

environmental agency, and "all other local approvals needed and all necessary

approvals from the State to develop Plat 57 into a homesite," Add.43 (citing

A2034); iv) Lost Tree was aware of at least one other wetlands fill permit issued

by the Corps during the same time period (around 2000) for a single lot in the

John's Island community, *see* A1753-56; and v) the Florida environmental agency

had "encouraged Lost Tree to choose a site specific project" at which to use certain

wetlands mitigation credits available to Lost Tree, which is what originally led

Lost Tree to identify and proceed at Plat 57, Add.52.

Given these facts, the CFC appropriately found that Lost Tree's investment-

backed expectations at Plat 57 "were not unreasonable." Add.13; Add.57 (citing

facts that "engendered objectively reasonable expectations on Lost Tree's part").

Indeed, the existence of a permitting scheme implies that permits can be obtained.

It is absurd to contend, as the government does, that because of the regulatory

scheme Lost Tree could not possibly have had a reasonable expectation of

obtaining a permit. To accept that contention would be to accept the rule that

*Palazzola* rejected, namely, that "[a] purchaser . . . is deemed to have notice of an

earlier-enacted restriction and is barred from claiming that it effects a taking." 533 U.S. at 626.[8]

The CFC recognized that Lost Tree's economic expectations at Plat 57 "were subject to the regulatory scheme then in place." Add.56. The CFC thus found that this *Penn Central* factor did not favor either party. Add.13. But to say that Lost Tree's expectations are subject to a permitting scheme is not to say, either legally or factually, that they are either non-existent or unreasonable. And ultimately, what matters under *Penn Central* is not the strength of the landowner's expectations, but "the extent to which the regulation has *interfered with* distinct investment-backed expectations." *Penn Central,* 438 U.S. at 124. Here, there can be no question that the Corps' permit denial *destroyed* what this Court has already recognized as Lost Tree's "distinct economic expectations" at Plat 57.[9]

---

[8] *Good v. United States*, 189 F.3d 1355 (Fed. Cir. 1999), which the government cites, *see* USBr39-40, 50, effectively adopted the rule that was later rejected in *Palazolla*. It thus lacks precedential value, particularly given the facts of this case outlined in the text.

[9] The government wrongly implies that Lost Tree needed a permit to fill wetlands at Plat 57 in when it purchased the property in 1974, emphasizing that certain regulations the government cites took effect "before Lost Tree bought Plat 57." USBr37-38 & n.37. In fact, the regulations that extended the Clean Air Act's definition of "navigable waters" to wetlands were first promulgated in 1975, after Lost Tree's purchase of Plat 57. *See United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 124-25 (1985). Ultimately this detail is beside the point because Lost Tree's more relevant expectations at Plat 57 were those that arose in 2001-02, when a federal wetlands fill permit was needed.

The government's third legal argument against Lost Tree's investment

backed expectations adds nothing to the first two.  Citing *Ruckelshaus v.*

*Monsanto*, 467 U.S. 986 (1984), the government contends that "the force of the

expectations factor is 'so overwhelming' in this case 'that it disposes of the takings

question.'"  USBr49 (quoting *Monsanto*, 467 U.S. at 1005).  For reasons already

discussed, the government is wrong to contend that Lost Tree's economic

expectations at Plat 57 are so lacking in legal and factual merit as to "dispose" of

the takings question.  In addition, *Monsanto* is clearly distinguishable.  That case

did not involve a regulatory scheme like that involved here under which a permit

might or might not be granted.  Instead, *Monsanto* involved a statute which stated

explicitly that during one time period "EPA could use [Monsanto's trade secret]

data without Monsanto's permission," 467 U.S. at 1006, and during another time

period, "gave Monsanto explicit assurance that EPA was prohibited from

disclosing [such] data," *id.* at 1011.  Given that statutory language, the Supreme

Court concluded that during the first time period "*Monsanto* could not have had a

reasonable, investment-backed expectation that EPA would keep the data

confidential," *id.* at 1006, but during the second time period, the "explicit

governmental guarantee [of confidentiality] formed the basis of a reasonable,

investment-backed expectation," *id.* at 1011.

That analysis, based on that statute's explicit language, has no application in a regulatory permitting case like this, which instead – to the extent *Penn Central* applies – is governed by *Palazzola*.  As Justice O'Connor explained in her concurring opinion there, in the regulatory permitting context which that case also involved, the lower court there had:

> erred in elevating what it believed to be [petitioner's] lack of reasonable investment-backed expectations' to 'dispositive' status. . . . Investment-backed expectations, though important, are not talismanic under *Penn Central*.  Evaluation of the degree of interference with investment-backed expectations instead is *one* factor that points toward the answer to the question whether the application of a particular regulation to particular property "goes too far."

533 U.S. at 634 (O'Connor, J., concurring) (citation omitted).

>    **D.    If Reached, The "Character" Factor Also Strongly Supports A Taking Under *Penn Central*, Given The CFC's Factual Finding That The Corps "Singled Out Lost Tree For Adverse Treatment."**

As explained above, the mandate rule and law of the case bar consideration now of the CFC's findings regarding the character of the government action at issue here.  Those findings were made by the CFC before the previous appeal, they focus on Plat 57 alone, and they were not disturbed or remanded by this Court.

In any event, the CFC's findings about the "character" issue are factually and legally correct.  The CFC found as a fact that in denying the wetlands fill

permit at Plat 57, "the Corps singled out Lost Tree for adverse treatment." Add.13, 56. That factual finding is binding here, unless the government establishes it is clearly erroneous, which the government does not even claim. Nor could it. As the CFC reported, the Corps' project manager for Lost Tree's permit application, "Ms. Sadowski[,] testified that if an applicant other than Lost Tree had sought the permit, it would have been granted." Add.43 (citing A2209). And in fact, the Corps did grant a wetlands fill permit to another party for a lot in the John's Island community in 2000, just before Lost Tree sought to develop Plat 57. A1753-56. Based on these facts alone, the CFC was correct to conclude that under a *Penn Central* analysis, the "character" factor favors Lost Tree.

While the "character" factor in takings jurisprudence has not been well developed in the case law, it must be understood consistent with *Lingle*'s recognition that both *Lucas* and *Penn Central* "share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property." 544 U.S. at 539. Here, the Corps' targeted denial of the Plat 57 permit was the "functional[] equivalent" of a direct appropriation of property *from Lost Tree* that the government concededly would not have taken from another landowner.

In response, the government devotes virtually its entire discussion of the character issue to defending the Corps' permit denial, *see* USBr42-47 – noting, for

example, that "[w]etlands preservation is a matter of general public interest;" that supposedly "Lost Tree . . realized the reciprocal benefits of wetlands preservation when it capitalized on the 'open spaces' as a selling point of John's Island;" and that "the Corps' finding that Plat 57 contained 'extremely high-quality' wetlands was well-supported." But the legitimacy, and even the correctness under applicable regulations of the Corps' permit denial is not the issue in this takings case. *See, e.g., Loveladies,* 28 F.3d at 1175 ("What is not at issue is whether the Government can lawfully prevent a property owner from filling or otherwise injuring or destroying vital wetlands."). Under black letter law, in this takings suit Lost Tree must (and does) accept the Corps' permit denial and merely seeks compensation for its confiscatory effect. *See id.* ("The question at issue here is, when the Government fulfills its obligation to preserve and protect the public interest, may the cost of obtaining that public benefit fall solely upon the affected property owner.").

It is true that in addition to finding that the Corps' targeted Lost Tree the CFC found from the trial evidence that "the Corps' wetlands quality findings were suspect," USBr48, and the CFC cited that finding in its *Penn Central* "character" discussion. But contrary to the government's claim that this "amounted to a[n improper] collateral attack on agency decision-making," USBr48, it was simply a part of the CFC's assessment of the *Penn Central* character factor. In this takings

case, the CFC has no more authority to challenge the government's regulatory action than Lost Tree does.

Regarding the targeting issue, the government first disputes what it characterizes as the CFC's "conclusion that the Corps treated Lost Tree unfairly," USBr46, by again defending the correctness of the Corps' decision to deny the Plat 57 permit. *See* USBr46-47. In addition to the fact that the correctness of the permit denial is not in dispute here, the issue with respect to the "character" factor is not whether the Corps targeted Lost Tree "unfairly." The issue is simply whether the Corps did in fact "target" Lost Tree and thereby deny it valuable property rights that the Corps would have allowed another landowner to enjoy. The CFC found as a fact that it did. And the government's further contention that "[a]n applicant claiming to have been 'unfairly singled out for disproportionate treatment' by agency officials must contest that treatment in an 'administrative and judicial challenge to the denial of its permit," USBr46 (quoting *Rith Energy, Inc. v. United States,* 270 F.3d 1347, 1352 (Fed. Cir. 2001)), again confuses a challenge to an agency permit denial, which this case does not involve, with a takings claim for compensation, which it does – and in which the targeted character of the agency's regulatory action is relevant.

Finally, the government makes the remarkable assertion – contrary to the CFC's finding of fact and contrary to the CFC's reference to the testimony of

Corps Project manager Ms. Sadowski supporting that finding of fact, *see* Add.43 –

that Ms. Sadowski did not in fact give that testimony.  Tellingly, however, the

government does not even claim that the CFC's factual finding on this issue was

clearly erroneous.  That is not surprising, because the transcript of Ms. Sadowski's

cross-examination testimony, based on answers she gave at her deposition, clearly

supports the CFC's finding:

> MR. STOUCK: Question on line 9
>
> "Question: . . . So would it have made a difference. . . with the Corps
> decision on the Plat 57 permit application if all of the things were the
> same, but the applicant was seeking to build a home for his or
> herself."
>
> "Answer:  Yes, I believe it would."

A2209.  The government's attempt to dispute this testimony and the CFC's

resulting factual finding that the Corps targeted Lost Tree, based on Ms.

Sadowski's answer to a different hypothetical, is without merit.

## III.    The Government's Criticism Of This Court's Prior Decision Is Misplaced And Meritless.

As the CFC recognized on remand, this Court's prior holding that Plat 57

alone is the only relevant property to consider in addressing Lost Tree's takings

claim effectively dictates the outcome here – it means that the Corps' permit denial

eliminates all economic use of the relevant property and targets that property, thus

constituting a taking under both *Lucas* and *Penn Central*.  At the end of the day,

the government evidently recognizes this consequence of the prior decision. It therefore "preserves its disagreement with the earlier panel ruling," and suggests a need for "further appellate review," even while acknowledging that "[t]his Court's parcel-as-a-whole ruling is law of the case for purposes of presentation to a subsequent three-judge panel." USBr51-52.

But the government already asked this Court to rehear the previous panel decision *en banc,* which the Court declined to do so without any recorded dissent, Add. 27-28, and the Court has frequently held that only the Court sitting *en banc* can reverse a prior panel ruling. *See, e.g, Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1316 (Fed. Cir. 2013) (Stating that "panel opinions, like en banc opinions, invoke the principle of stare decisis. Panel opinions are, of course, opinions of the court and may only be changed by the court sitting en banc."); *see also Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1309 (Fed. Cir. 2008) ("A prior precedential decision on a point of law by a panel of this court is binding precedent and cannot be overruled or avoided unless or until the court sits *en banc*.").

Even more fundamentally, the principal reason the government now offers for its "disagreement" with this Court's previous decision is contrived and wrong for multiple reasons. The government states that "[i]t is perverse that Lost Tree's vociferous denial of investment-backed expectations – a factor of 'particular

significance' to the takings inquiry, *Penn Central*, 428 U.S. at 124 – was precisely

what allowed the company to circumvent *Penn Central* and [establish a *Lucas*

taking] before the trial court." USBr52.  Lost Tree, however, has never denied

investment-backed expectations for Plat 57.  To the contrary, Lost Tree cited and

relied on what this Court agreed were Lost Tree's "distinct economic expectations"

for Plat 57 that first arose in 2001-02.  *See* Add.25 ("After a careful review of the

entire record, this court determines that the relevant parcel is Plat 57 alone.  The

trial court's factual findings support the conclusion that Lost Tree had distinct

economic expectations for . . . Plat 57.").

In addition, the government's criticism of this Court's prior holding as

"perverse" has no merit because it is settled law in this Circuit that investment-

backed expectations are not even relevant in a case like this one where the

government's regulatory action establishes a *Lucas* taking.

Accordingly, the government's "disagreement" with this Court's prior

decision should be disregarded.

## CONCLUSION

The Court should affirm the CFC's judgment.


 /s/Jerry Stouck
Jerry Stouck
Greenberg Traurig LLP
2101 L Street NW, Suite 1000
Washington, DC 20037
(202)331-3173
stouckj@gtlaw.com

*Counsel for Appellee Lost Tree Village
Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2014, I filed and served the foregoing with the Clerk of Court by causing a copy to be electronically filed via the appellate CM/ECF system.  I also hereby certify that the participants in the case are registered CM/ECF users and will be served via the CM/ECF system.

__/s/Jerry Stouck_____

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Reply Brief of Plaintiff-Appellee complies with the type-volume limitation of Federal rule of Appellate Procedure 32(a)(7)(B) and contains 10,192 words, excluding the part of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point.

   /s/Jerry Stouck         